## SUPREME COURT—IN ADMIRALTY.

### OCTOBER TERM—1875.

*Allen, Ch. J., Harris and Judd, J. J.*

R. B. AVERY ET AL. *vs.* STEAMSHIP CYPHRENES.

A VESSEL, though in charge of a pilot, the taking of whom is compulsory, colliding with another, is not thereby exonerated from responsibility for damages caused by the collision.

A steamship entering a harbor is bound to exercise great care and diligence, and must avoid a ship at anchor or at the wharf, if it be practicable and consistent with her own safety.

Section 608 of the Civil Code construed.

ALLEN, Ch. J. This is a libel in *rem.* against the British Steamship Cyphrenes for damages caused by collision with the British ship Ravenstondale, owned by the libellants. The steamer is a passenger and freight boat, and is running between the British Colonies of Australia and San Francisco.

It appears in evidence that the Ravenstondale was at anchor in the harbor of Honolulu, and that the steamer in the daytime, on her passage to her berth at the wharf in said harbor, collided with the Ravenstondale and caused the damage complained of, and the question is, whether the steamer is liable?

It is contended on the part of the respondent that as the steamer was under the charge of a pilot—if the collision was caused by the neglect or mistake of the pilot, that the owners of the Cyphrenes are not liable according to the general principles of the maritime law, or by express statute. In the case of the Neptune the Second, which was decided two years after the passage of the statute of 52 George III., which contained a provision that the owner, or master, of any ship shall not be answerable for any loss or damage occasioned by the neglect, incompetency or incapacity of any licensed pilot, Sir William Scott did not advert to the statute in giving his opinion, but said, if the mere fact of having a pilot on board, and acting in obedience to his directions, would discharge the owners from responsibility, I am of opinion that they should be excused in the present case. I think it is sufficiently established in proof that the master acted throughout in conformity to the directions of the pilot. But this I conceive is not the true rule of law. The parties who suffer are entitled to have their remedy against the vessel that occasioned the damage, and are not under the necessity of looking to the pilot, from whom redress is not always to be had for compensation."

In the case of the Girolamo, 8 English Admiralty Reports, 169, the Court ruled that a foreign ship, though in charge of a licensed pilot, is liable for the full amount of damages arising from a collision for which she alone was to blame, notwithstanding the stat. 1 and 2, George IV. c. 75, and 6 George IV. c. 125, which do not extend to proceedings in this Court. The Instance Court of Admiralty is guided by

the principles of international and not by those of the municipal law. There were several British pilot acts passed in the reigns of George III. and George IV., and also the Shipping Act of the 17th and 18th Victoria. All of them contain a provision to the effect, that the owner or master of any ship shall not be answerable for any loss or damage occasioned by the neglect, default, incompetency, or incapacity of any licensed pilot. The Court say, in the same case, that "it cannot be doubted that before these statutes were passed exonerating masters and owners where a licensed pilot is in charge of a vessel, that remedy existed in this Court, and the Legislature has not in express terms taken it away." The vessel was held liable, although in charge of a licensed pilot at the time of the collision. There were several other cases involving the same facts and principles, and were decided in the same way by the same judge. So the English law stood until the decision of Dr. Lushington in the case of the Protector. The causes referred to above were overruled by him and held the true rule to be, that the statute took away the responsibility of the vessel, when the accident was imputable to be fault of the pilot *alone.* It may be regarded as settled in England, that if the pilot is alone in fault, the owners are not liable.

The same question was involved in the case of the steamer China, 7 Wallace 53, which was decided by the Supreme Court of the United States. This steamer, a foreign vessel, was bound from the port of New York, and being in pilot waters, and in charge of a licensed pilot of that port, ran into a vessel of the United States and sunk her. The collision, as the Court say, was occasioned by the gross fault of the licensed pilot then in charge of the vessel. The Court decided that under the statute of New York, vessels were compelled to take a pilot. But held further, 7 Wallace 53 (the statute containing no clause exempting the vessel or owners from liability from the pilot's mismanagement) that

" the responsibility of the vessel for torts committed by it not being derived from the law of master and servant, or from the common law at all, but from maritime law, which impressed a maritime lien upon the vessel in whomsoever hands it might be for torts committed by it, the fact that the statute thus compelled the master to take the pilot, did not exonerate the vessel from liability to respond for torts done by it, as, ex. gr., for a collision, though the result only of the pilot's negligence."

Mr. Justice Ware says in his 2d volume (98, The Huntress) of reports that " a Court of Admiralty is a Court of the law of nations and derives in part its jurisdiction from that law. The maritime law in its general principles as applicable to shipping, has a higher antiquity than any other existing system of law, and has become so fully recognized by the commercial world, that no Court can with propriety depart from its principles and practice, unless by special act of legislation. In England the maritime law has been superceded by an act of Parliament as to the liabilities of owners of vessels in cases of collision, but no such enactment has been made by the Legislature of this Kingdom, and therefore this case must be decided upon the general principles of the maritime law, unaffected by statute provisions, and this renders the vessel liable for a collision attributable to the pilot's mismanagement ; and it can only be upon the ground that the general admiralty laws have been superceded by an act of Parliament that the owners of vessels are exonerated from liability in case of collision.

In the case of Yates et al. *vs.* Brown et al., 8 Pick., 23. The facts in this case are very similar to the case at bar, and the question reserved for the whole Court was, whether, there being a person duly authorized to pilot the vessel, the owners of the vessel were liable for an injury arising from negligence or mismanagement in navigating the vessel out of the harbor. Parker, C. J., in giving the decision of the

Court, says, that the owner of a vessel, which through the fault or negligence of any one on board, injures another vessel by running foul of her, is liable to the injured party, although there be a pilot on board who has the entire control and management of the vessel.

The same principle is recognized in 160, 161, Abbott on shipping and note to the American edition : Bussy *vs.* Donaldson, 4 Dotlers, 206. Fletcher *vs.* Rroddick, 5 Bos. and Pul., 182. The bark Lotty, Olcutt's Adm., p. 329.

It is argued that as the statute compels the payment of half pilotage, that it is compulsory and therefore exonerates the owners from responsibility. The statute, judging from its terms, was not passed for such a purpose, and does not involve any such consequences. It was passed merely to sustain the system of pilotage, and for no other purpose whatever. The Court would require clear and explicit enactments by the Legislature before it would be justified by the maritime law to change its principles and alter the ordinary rules of judicial construction. To displace a lien, and defeat a recourse in *rem.* and thereby release recognized responsibility or impose new obligations as well as to limit the rights of the parties injured to the individual pilot, cannot be inferred from such a statute, although the pilot is answerable like other persons for any harm he may do, by negligence or default. It would be a summary mode of defeating the great principles of Admiralty jurisprudence, which no power can do, except a Parliament or Legislature, and that in express terms.

It is very true that by Section 388 of the English Merchant and Shipping Act, that *no owner or master* of any ship shall be answerable for any damage occasioned by the fault of the pilot, when the employment of the pilot is compulsory. Had the same principle of responsibility been recognized prior to the statute, it probably would not have been passed, and the English authorities are against this position.

The statutes of New York and Massachusetts contain similar provisions to our own, and the Courts have not considered them as affecting the rights of parties in any other respect than the payment of the pilotage.

Chancellor Kent in his 3d volume Com., 238, says, that the pilot when on board has the exclusive control of the ship. He is considered as master *pro hac vice,* and if injury is sustained in the navigation of the vessel, while under the charge of the pilot, he is answerable as strictly as if he was a common carrier for his default, negligence, or unskillfulness, and the owner would also be answerable to the party injured for the act of the pilot, as being the act of his agent.

It is contended on the part of the respondents that the Ravenstondale was solely to blame, as she was in an improper place and obstructed the navigation, the Civil Code requiring that all vessels that may enter any port shall be anchored in the place designated by the Harbor Master. It is in evidence that the Harbor Master moved the vessel, and he says that " I regard the Ravenstondale to be in a perfectly safe position." He adds that when the Ravenstondale first arrived "we put her alongside the wharf to get iron out, that the ship might be repaired and then we dropped her off." He says, that she occupied a little over one third of the channel, that she is 295 feet long, and 25 feet from the wharf and that there remains more than five hundred feet of clear water.

It is a well established maritime rule that when a vessel is entering a harbor she is bound to exercise great care and diligence.

Culbertson *vs.* Shaw, 18 Howard, 584, 587, Ward *vs.* Schr. Darisman, 6 McLean, C. C., 239. If a ship at anchor and one in motion come in collision, the presumption is, that it is the fault of the ship in motion, unless the anchored vessel was where she should not have been.

Strout *vs.* Foster, 1 Haw. Rep., 89; The Scotia, Davies, 359. But whether she be in a proper place or not, and be prop-

erly anchored or not, the other vessel must avoid her if it be practicable, and consistent with her own safety.

Per Dr. Lushington in the case of the Batavia, 10 Jur., 19; Knowlton *vs.* Sandford, 32 Maine, 148.

It cannot be denied that the steamer could have avoided the ship, as the United States frigate Pensacola had done in passing through the same portion of the harbor prior to the collision and by the steamer Mikado subsequently. It will be borne in mind that the steamer entered the harbor in the day time, in good weather and the ship which was in full view, occupied but a little more than one third of its width. But the pilot probably took the course he did, which was direct to the steamer's wharf, relying upon the steamer to answer his orders promptly. He attributes the accident to the bad steering of the steamer, and he adds also, that had she backed in time, and had the anchor gone down, and the jib been hoisted as ordered, the accident would not have happened. But the master of the steamer attributes the accident to the jib-boom of the ship being rigged out, and to save the jib-boom by a reversal of the engine the accident occurred.

There is most contradictory evidence in relation to the management and action of the steamer immediately before the collision; but I do not regard it necessary for the purposes of this investigation to analyse it, and to give an opinion as to its comparative weight, as it is immaterial in view of the circumstances of this case whether the fault was with the pilot, or the steamer, for in either case it would not be a defence to this suit. Indeed it is the duty of the Court to confine its decision to the rights of these parties, and not by indirection, give an opinion affecting the rights of others, which have not been represented.

There is no pretence that the injury occurred by inevitable accident, and it is very evident that it was not necessary for the steamer to be in such dangerous proximity to the ship.

Mr. Justice Clifford said in the case of Wakefield et al. *vs.* steamer Governor, 1 Vol. Clifford's R., 96, that occurring as the collision did, in the day time, and in good weather, and at a place where there was no want of sea room and no obstruction to the navigation, it is clearly a case where the rule applies, that a sailing vessel shall keep her course, and leave it to the steamer to adopt the necessary precautions to avoid a collision. The rule applies with more force to a vessel at anchor.

The respondent contends further that the libellants cannot recover, inasmuch as the vessel had violated the law in not rigging in their jib and flying jib-booms.

By Section 608 of the Civil Code it is enacted that "all vessels entering port shall, if so requested by the Harbor Master or any pilot, rig in their jib, flying jib, and spanker booms, and spritsail yards, and top their lower and topsail yards, within 24 hours after anchoring in such port; and in all cases before attempting to come alongside of, or make fast to either of the docks or wharves, and keep them so rigged in and topped until within 24 hours before leaving the harbor and until after removing from any wharf or dock, under a penalty of a fine not exceeding $100."

The Harbor Master testified that he did not direct the jib-boom to be rigged in, and did not consider it necessary, and adds, "I regard the Ravenstondale as being in a perfectly safe position."

It is not incumbent on vessels, unless requested by the Harbor Master to rig in their jib-booms—and it is not pretended that any such request was made.

But it is contended, that while a request is necessary for vessels on entering the harbor, it is not made imperative by the last clause of the section, in which it says, "that in all cases before attempting to come alongside of or make fast to either of the docks or wharves, and keep them so rigged in and topped until within 24 hours before leaving the harbor,

83

and until removing from any wharf or dock, under a penalty of a fine not exceeding $100."

This presupposes that the vessels have rigged in their jibs, jib-booms, &c., on entering the harbor, and it makes it imperative to keep them so rigged in and topped until 24 hours before leaving the harbor. The penalty applies for a violation of law on entering the harbor as well as when the vessels come alongside of the dock. It is an entire section and must be taken in its connection and from the evidence there has been no violation of either provision.

The counsel for the respondents contend "that Courts of Admiralty in suits between foreigners will decide according to the laws of the country to which the ships belong."

This position is repugnant to the general principles of International law.

In the case of Smith et al. *vs.* Candey, 1 How. R. 28, which arose from a collision in the port of Liverpool, between two American vessels, the Court ruled, that the question whether there is a legal liability for the consequences of a collision in an English port, must be determined by the laws of England, and that when a collision occurs in a port of a foreign country, the rights and responsibilities of the parties are to be determined according to the laws of that country.

Conkling Adm. 305.

I suppose that Courts always regret that foreigners can not be remitted to their domestic forum for the settlement of their difficulties and for the adjudication of their legal rights. But it a duty imposed by international law and as a matter of comity, in cases like the one at bar to entertain the jurisdiction. Indeed the home forum is so remote, that it might be regarded as a neglect of international duty and a decided want of comity, and to some extent a denial of justice, to refuse to entertain it. But when a Court entertains the jurisdiction it must be governed by the laws of the country where the act complained of took place.

In view of the law and circumstances of the case, I am of opinion that a decree must be entered for the libellants. I regard the true measure of damages to be the amount actually sustained by the party at the time and place of the injury.

BY THE FULL COURT.

This case came on for hearing before the Chief Justice, who, on the 6th September, adjudged that a decree should be entered for the libellants for the full amount of the damages actually sustained.

From this judgment an appeal was taken to the full Court.

Having heard the arguments of counsel and considered the same, we are of opinion that the judgment of the Chief Justice should be affirmed; and we adopt his reasons with this modification.

The Section 608 of the Civil Code, reads as follows: "All vessels entering port shall, if so requested by the Harbor Master or any pilot, rig in their jib, flying jib, and spanker booms, and spritsail yards and top their lower and topsail yards, within 24 hours after entering such port; and in all such cases before attempting to come alongside of, or make fast to either of the docks or wharves, and keep them so rigged in and topped until 24 hours before leaving the harbor, and until after removing from any wharf or dock, under the penalty of a fine not exceeding $100."

The construction that we have placed upon this statute is, that the words, "in all cases," in the fourth line, refer to the time, thus, if the vessel on entering the harbor, comes to anchor and is requested by the Harbor Master to rig in her booms, &c., she may have 24 hours wherein to obey the order, but if she is to come alongside the wharf, even though it may be on the day on which she arrives, and is requested by the Harbor Master to rig in her booms, &c., she must do so at once, and cannot wait for the 24 hours after she has got

alongside the wharf.   But the request of the Harbor Master is always necessary, in order to impose upon the vessel the obligation to rig in her booms.

But even if this be not the proper construction of the statute, and if the Ravenstondale was in disobedience to the statute in not having rigged in her jib-boom and flying jib-boom, though not having been requested so to do by the Harbor Master, it would furnish no defence for the steamer.

The only question is, whether the Cyphrenes was in fault, and whether the steamer could have avoided the ship, if proper precautions had been taken; and it would be superfluous to enquire, whether the ship was obeying in all respects the harbor regulations.

"When the collision was caused by a vessel having the power to move or stop at her pleasure, in a channel of sufficient breadth, without any superior force compelling her to the place of collision, the fact that the steamer did collide with the ship is conclusive evidence that she was not properly managed," (Granite State, 3 Wallace, 314) more especially when it is shown that the collision occurred in broad daylight and that the ship which was moored to the wharf, could be seen all the way from the entrance of the harbor and even before entering.

The Court while affirming the judgment of the Chief Justice adopts his reasoning with this slight modification.

A. S. Hartwell, proctor for libellants.

E. Preston and E. T. O'Halloran, proctors for respondents.

Honolulu, October 20th, 1875.